IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.   CRIMINAL ACTION NO.   3:13-00123

LENARD JOSEPH STEWART
    also known as "Shawn"
ERIC JEREMIAH STEWART
    also known as "E"
CHARLES EDWARD ALLEN III

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Eric Stewart's Motion to Suppress (ECF No. 33)—also joined by Defendants Lenard Stewart and Charles Allen III—, and Defendant Allen's Motion to Suppress (ECF No. 34)—also joined by Defendant Lenard Stewart. Also pending is Defendant Eric Stewart's Motion to Withdraw Previously Filed Motion to Suppress of Eric Stewart (ECF No. 85). The Motion to Withdraw Previously Filed Motion to Suppress of Eric Stewart is **GRANTED**. Thus, Defendant Eric Stewart's Motion to Suppress is **DENIED as moot**. After hearing the evidence and argument presented by the parties during the October 15, 2013, pretrial motions hearing, Defendant Allen's Motion to Suppress is **DENIED**.

In his Motion, Defendant Allen argues officers entered Room 265 without a warrant and without an exigent circumstance justifying entry without a warrant. Def. Allen's Mot. to Suppress 2, ECF No. 34. In its Response, the Government argues that exigent circumstances existed—under

1

the emergency doctrine—which justified the officers' entry into Room 265 without a warrant. Gov't's Resp. to Defs.' Mots. to Suppress 5, ECF No. 38.

Warrantless searches are presumptively unconstitutional, but there are certain recognized exceptions to the warrant requirement. *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013). One such exception is when exigent circumstances justify warrantless entry to "assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Accordingly, law enforcement officers may enter a home without a warrant . . . to protect an occupant from imminent injury." *Id.*

"Under . . . [the] general emergency-as-exigency approach, in order for a warrantless search to pass constitutional muster, 'the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'" *Yengel*, 711 F.3d at 397 (quoting *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *Stuart*, 547 U.S. at 404 (internal quotation marks omitted). "An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom." *Moss*, 963 F.2d at 678. One of the "non-exhaustive list of factors" used by the Fourth Circuit when "determining whether an exigency reasonably justified a warrantless search" is "the degree of urgency involved and the amount of time necessary to obtain a warrant." *Id.*

Based on the testimony offered at the pretrial motions hearing, the Court finds that the officers entering Room 265 had an objectively reasonable belief—based on specific articulable facts and reasonable inferences that could have been drawn therefrom—that an emergency existed that required immediate entry to render assistance or prevent harm to persons within.

The Court finds the pertinent facts as follows: On December 20, 2012, Barboursville Police Chief Mike Coffey's secretary received a call from Amanda Small in Michigan, stating that Ms. Small's daughter, Kelsey Albaugh, was being held against her will and assaulted by her pimp—whom Ms. Small believed to be a fugitive from Michigan—at the Best Western hotel in Barboursville. Ms. Small also stated that Ms. Albaugh was with another woman named Megan and that they were travelling in a late-model Ford Fusion with Kentucky registration plates and a missing rear spoiler. Ms. Small stated that her information was based on text messages being sent by Ms. Albaugh to her cousin. Coffey and another officer travelled to the hotel, located a vehicle precisely matching this description, ran the vehicle's registration, and found that the vehicle belonged to Joseph and Vicky Pezoltd. Coffey then spoke with the hotel clerk and found out that rooms 258 and 265 were rented under "Megan Pezoltd." The clerk stated that the rooms were paid for in cash by two women who came to the lobby. One was a tall, thin Caucasian female with dark hair and one was a young, Caucasian female with red hair. Coffey then called Ms. Small back, verified the details of her earlier call, and ascertained that the red haired woman's description matched Ms. Albaugh. Next, Coffey called the Cabell County Sheriff's Department (CCSD) since the hotel was not within his jurisdiction. CCSD deputies and members of the U.S. Marshals Service—including Deputy U.S. Marshall John LaJeunesse—arrived. LaJeunesse and Deputy Enochs had been riding in the same car when they received a call—relayed from Enochs to

3

LaJeunesse—that a man named "Shawn," possibly a fugitive with a warrant out for his arrest on a serious crime, was holding a woman against her will in the Best Western hotel. They hurried to the scene. Upon arrival, LaJeunesse spoke with the hotel clerk, who described the vehicle associated with Rooms 258 and 265, said that Megan Pezoltd had rented the rooms, and said that s/he saw a couple "black guys and white girls" coming in and out. LaJeunesse briefed the other officers on the scene, put one man outside the northern side of the hotel and another outside the southern side of the hotel, then went to the second floor with the remaining officers. Upon reaching the second floor, the team saw that the door to Room 258 was ajar, so they stopped and decided that the bulk of the officers would enter 258, leaving LaJeunesse and CCSD Deputy James Johnston to proceed to Room 265. The doors to the two rooms were about twenty feet apart on the same hallway. When LaJeunesse and Johnston were in position, LaJeunesse gave a nod to the officers outside Room 258 to proceed. The officers at Room 258 slapped the door open and proceeded into the room, yelling "Police!" repeatedly. Within a couple of seconds and before LaJeunesse or Johnston knocked on the door to Room 265, the door opened, a man popped his head out to look down the hall, saw Johnston in uniform directly outside his own door, said, "Oh, shit," and closed the door fast enough that Johnston—despite trying—was unable to prevent the door from shutting. LaJeunesse then heard rapid shuffling and muffled shouting inside of Room 265. He used a key to get into the room. One man was already flinging himself head-first outside of the window, one had his leg over the window sill, and the third was hurrying toward the window. Importantly, at the time LaJeunesse and Johnston entered Room 265, they did not know whether the officers who entered Room 258 had found Kelsey Albaugh.

4

Given LaJeunesse and Johnston's objectively reasonable belief, supported by the details gathered through the due diligence of Chief Coffey, that a woman was being held against her will inside either Room 258 or Room 265—together with the extra factors of the man in Room 265 opening the door, seeing Johnston in uniform, saying, "Oh, shit," and slamming the door and then the immediate muffled noises of flight inside of the room—, their entry into Room 265 was justified under the emergency exception to the warrant requirement. First, Amanda Small was a reliable informant[1] who—despite being located in another state—provided detailed information[2] about her daughter's whereabouts and situation at the Best Western hotel, including the name of Ms. Albaugh's travelling companion, the car they were using, and the location of the hotel. Second, that detailed information was corroborated[3] by Chief Coffey. Third, it was objectively reasonable for LaJeunesse and Johnston to conclude that the extra factors of 1) the man in Room 265 opening the door, seeing Johnston in uniform, saying, "Oh, shit," and slamming the door, and then 2) the immediate muffled noises of hurried action and shouting inside of the room[4] were supplemental evidence of a possible emergency inside Room 265.

For the reasons above, Defendant Charles Allen III's Motion to Suppress (ECF No. 34) is **DENIED**. Defendant Eric Stewart's Motion to Withdraw Previously Filed Motion to Suppress of Eric Stewart (ECF No. 85) is **GRANTED**. Thus, Defendant Eric Stewart's Motion to Suppress (ECF No. 33) is **DENIED as moot**.

---

[1] Ms. Small gave her name, location, and relationship to the alleged victim. Unlike an anonymous informant, an informant who "provides enough information to allow the police to readily trace her identity . . . subject[s] herself to potential scrutiny and responsibility for the allegations." *United States v. Reaves*, 512 F.3d 123, 127 (4th Cir. 2008). Thus, "a reasonable officer may conclude that the tipster is credible." *Id.*

[2] "A very detailed tip . . . may compensate for questions about the informant's reliability . . . ." *United States v. White*, 549 F.3d 946, 950 (4th Cir. 2008) (citing *Illinois v. Gates*, 462 U.S. 213, 234 (1983)).

[3] "[A] tip that relies on hearsay may be deemed reliable if police later can corroborate it." *Id.* (citing *Gates*, 462 U.S. at 241).

[4] By close analogy to the present situation, "consciousness of guilt may be deduced from evidence of flight." *United States v. Harris*, 43 F. App'x 719, 720 (4th Cir. 2002).

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel and the defendants, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S. Marshals Service.

ENTER: October 16, 2013

_____
ROBERT C. CHAMBERS, CHIEF JUDGE